FILED

2014 Mar-14  PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| WILLIE FANNETT THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 2:12-cv-00623-TMP |
| | ) |
| CITY OF BIRMINGHAM, et al., | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed by defendants City of Birmingham ("the City"), Police Chief A.C. Roper ("Roper"), and Officer Terry Davis ("Davis") on February 19, 2013.[1]   (Doc. 34).   Defendants seek dismissal of all of plaintiff Willie Fannett Thompson's claims based on immunities and other grounds.   Plaintiff has filed a brief in opposition, along with exhibits, and Defendants have filed a reply to that brief.   The parties have consented to the exercise of

---

[1]   Defendants filed a second motion for summary judgment on the same day to dismiss the claims of Willie Lee Thompson.   (Doc. 35).   Willie Lee Thompson's action, styled 2:12-cv-1772-TMP, was severed from the above-styled claim on June 18, 2013.   (Doc. 66). Willie Lee Thompson's case was dismissed on motion from the plaintiff on the same day. Accordingly, Defendants' motion for summary judgment in regards to the claims of Willie Lee Thompson (doc. 35) is MOOT and TERMINATED.

jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) (Doc. 16); accordingly, the court enters this memorandum opinion.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers

to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324 (quoting Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.   Celotex, 477 U.S. at 324.   "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   The substantive law will identify which facts are material and which are irrelevant.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249.   His guide is the same standard necessary to direct a verdict:   "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).   However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material

facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## FACTS

For purposes of summary judgment, the facts viewed favorably to the non-moving plaintiff, are as follows.[2] The plaintiff, Willie Fannett Thompson, along with her family, cares for a piece of family-owned property on 320 Beta Street by periodically removing garbage that is dumped on the vacant lot. Defendant Terry Davis, at the relevant time, was a police officer with the Birmingham Police Department, and defendant A.C. Roper

---

[2] Of course, these may or may not be the true facts determined after a trial.

was (and still is) the Birmingham Police Chief. The third defendant is the City of Birmingham.

On July 7, 2010, Davis, who was on duty with the Birmingham Police Department and patrolling nearby, responded to a call at 320 Beta Street. Voltaire McGinnis, who lives next door to the lot owned by plaintiff and her family, had reported to the Birmingham Police Department that a woman was cleaning off her family land and putting the garbage in an alley behind McGinnis's house. Plaintiff Willie Fannett Thompson had called the City sanitation department on or around July 7, 2010, regarding the garbage pick-up schedule and informed the City that the trash would be in the alley behind the property. She was told that garbage pick-up would occur on Friday, July 16, 2010. (Doc. 57-1, pp. 21-22). While picking up garbage and debris on her lot, plaintiff was placing it in a box to be put in the alley for pick up.

Plaintiff and McGinnis had conflicts about trash in the alley on earlier occasions. On July 7, McGinnis again confronted plaintiff, telling her not to put the picked-up trash in the alley behind his house because he would have to move it from there. When plaintiff did not respond to McGinnis, he said that he would have to call the police, to which plaintiff replied that it was a good idea.

Officer Davis approached plaintiff, who standing inside the fence around her property, and informed her that she could not put garbage in the alley and instructed her to put the garbage in front of the house for the City to pick up. (Doc. 57-1, p 27). Officer Davis volunteered to help plaintiff carry the box of trash to the front curb. Plaintiff

5

informed Davis that she always put the garbage in the alley and that the City was aware of this and would pick it up.   (Doc. 57-1, p. 27).   Plaintiff stated   that she was unable to lift the full box by herself and that she did not want to take the box out front because it was a very hot day, she was experiencing "hot flashes," and she was irritated with McGinnis, who had called the police about the trash.   (Doc. 57-1, p. 28).   At this point, Willie Lee Thompson ("Mr. Thompson"), plaintiff's father, arrived and began collecting trash off the property and putting it into the box.   Davis informed Mr. Thompson that if he saw Mr. Thompson put anything in the alley Davis would issue him a $500.00 citation for "criminal littering."   (Doc. 57-2, p. 26).   Plaintiff told Davis that she was "fine" with him issuing the citation and that she would dispute it in court.

Up to this point, plaintiff and her father had not put anything in the alleyway; she and her father were filling boxes she had brought from work and planned to move them to the alley when they were full.   (Doc. 57-1, pp. 32-34).   Before plaintiff or Mr. Thompson moved any boxes to the alley, Davis placed Mr. Thompson under arrest.   (Doc. 57-1, p. 33).   Mr. Thompson immediately dropped the box he was holding and put his hands behind his back, in compliance with Davis's instructions, and Davis placed Mr. Thompson in handcuffs.   (Id.)   Plaintiff, who was facing away from Davis and her father, placed her hands behind her back where Davis could see them, anticipating that she also would be arrested.   (Doc. 57-1, p. 36).   Instead of handcuffing plaintiff, Davis ran around from behind plaintiff and began choking her and shaking her neck "relentlessly."   (Id.)   Then,

Davis punched plaintiff in the face[3] (Doc. 57-1, p. 46) and put her in a "headlock," lifted her, and slammed her to the ground.[4]   (Doc. 57-1, p. 38-39).   He then lifted plaintiff and threw her to the ground a second and third time.   (Doc. 57-1, p. 39).   Davis rolled plaintiff over several times and pushed her face into the ground (Doc. 57-1, pp. 40-41), while placing his knee on plaintiff's back and twisting her arm behind her.   (Doc. 57-1, p. 41). Plaintiff told Davis, "don't twist my arm.   If you're going to cuff me, cuff me."   (Id.)   He replied, "Bitch, I'll break your fucking arm."   (Id.)   Plaintiff testified that the only physical responses she made were "natural responses," and that she did not have an opportunity to push, hit, shove, or kick at Davis.[5]   (Doc. 57-1, p. 42).   At the time of the incident, Davis was twenty-six years old, five feet eleven inches tall, and weighed 170 pounds, while Fannett was forty-eight years old, five feet four inches tall,[6] and weighed 125 pounds.

---

[3]  Davis testified that he does not remember punching plaintiff, but admitted that "there are things that you do in intense situations that you don't recall." (Doc. 58-3, Davis Depo. p. 121, lines 2-6).

[4]  Davis testified he took plaintiff to the ground using a "leg sweep," and Plaintiff cites the statement as a fact in her response to Defendants' motion for summary judgment.   However, the court is excluding the "leg sweep" testimony from the memorandum opinion because plaintiff's deposition does not mention a "leg sweep."

[5]  Defendants cite the testimony of McGinnis that plaintiff attacked Davis "like a squirrel jumping on a tree," but this is contradicted by plaintiff's testimony, which the court must accept as true.

[6]   In plaintiff's deposition she states that she is five feet six inches tall.   (Doc. 57-1, at 39).   However, the arrest report indicates that she was five feet four inches tall on the date of the incident.   (Doc. 60-5).   Plaintiff's response to the Defendants' motion for summary judgment also states that she was five feet four inches tall at the time of the incident.   (Doc. 56, p. 11).   The court will consider the police report to be correct in regards to plaintiff's height as it is the most

Finally, Davis placed handcuffs on plaintiff and told her to sit up.   (Id.)   When Davis turned to walk toward his vehicle, plaintiff noticed her cellphone had fallen out of her pocket and was on the ground.   (Id.)   She maneuvered her hand to reach her phone and then called her sister.   (Doc. 57-1, p. 42-43).   As plaintiff was yelling into the phone for her sister to come because plaintiff and Mr. Thompson were being arrested, Davis came back and kicked her phone down the alley, saying, "bitch, I didn't tell you you could use no fucking phone."   (Doc. 57-1, p. 46).   Davis then pulled plaintiff's hairpiece[7] off of her head, tossed it down the alley, turned her head toward him, pulled out his pepper spray, and sprayed her in the face three times.   (Doc. 57-1, p. 47).   Davis was holding the pepper spray container about five inches from plaintiff's face.   (Id.)   Plaintiff does not recall Davis calling for backup assistance, and she could not hear because Davis had walked back to his car.   (Doc. 57-1, p. 36).

Fannett suffered severe bruising and scrapes to her face during her encounter with Davis.[8]   (Doc. 59-1).   Davis testifies that he does not recall punching Fannett in the face. (Doc. 58-3, p. 36).   In regards to his lack of memory, Davis states: "In the time of conflict

---

favorable version of the fact, tending to show the disparity in height and size between plaintiff and Officer Davis.

[7]   Fannett's hairpiece was secured to her hair with a comb and roughly ten bobby pins. (Doc. 57-1, p. 46).

[8]   Defendants object to this statement on the grounds that it is "an opinion of Plaintiff or her attorneys based on a photograph, not fact."   (Doc. 67, p. 2).   The photographs are in the record as Exhibit K to plaintiff's opposition to summary judgment.   (Doc. 59-1).   The photographs appear to show abrasions on plaintiff's right forehead and left temple.

not everything is recalled."   When asked if he would not recall punching a woman in the face, he answered: "[n]ot during the time of high intensity conflict, no.   There are things that you do in intense situations that you don't recall."[9]   (Doc. 58-3, p. 37).

Plaintiff testified that she had an MRI between four and five months after her encounter with Davis (during which time she had not had any other accident or injury), and the MRI indicated tearing and fraying in the tendons of her wrist, which required surgery to repair.   (Doc. 57-1, pp. 116-117; Doc. 62).   She also has been treated with medication for depression and anxiety, for which she testifies she had never been treated prior to her encounter with Davis.   (Doc. 57-1, pp. 121-123).

After plaintiff filed a formal complaint (called a 131 form) against Davis with the Internal Affairs Division ("IAD") of the Birmingham Police Department ("BPD"), the IAD investigated the circumstances surrounding the arrests of plaintiff and Mr. Thompson, and exonerated Davis of all claims and allegations against him, based on the testimony of McGinnis and Davis.   Neither plaintiff nor her father, Mr. Thompson, were interviewed as part of the investigation.   Davis's supervisor at the time of the incident, Sergeant Phyllis Jones ("Jones"), at the time of her deposition, had never reviewed plaintiff's arrest report.

---

[9]   In the course of Davis's deposition, he made a comment that hitting someone in the face and causing bruising "could be" something that one would desire to "consciously forget." (Doc. 58-3, p. 44).   Plaintiff includes this statement as a "disputed fact" in her response to Defendants' motion for summary judgment.   Defendants object on the basis that it constitutes speculation.   As Davis's statement is an answer to a hypothetical question, it does not constitute a "fact," and the court will not include it in the fact statement of this memorandum opinion. Further, the testimony goes only to Davis's credibility with respect to the events at issue, and the court already is required to take the version of the facts most favorable to the plaintiff, making Davis's credibility at this point irrelevant to the summary judgment assessment.

(Doc. 58-1, p. 65-66).   During her time as Davis's supervisor, Jones never reviewed his Internal Affairs Reports and had no idea if or how many times Davis had been in trouble for using excessive force. (Doc. 58-1, p. 71).   Neither Jones nor her supervisor, Captain McCaskey, reviewed the Use of Force report filed by Officer Davis, and neither discovered that it was inaccurate and incomplete.   According to the criminal trial docket, all charges stemming from Davis's arrest of plaintiff (Case Number 011290721) were dismissed because Davis failed to appear for at least three settings of the case.

As early as 2009, Police Chief Roper acknowledged that Birmingham police supervisors need to do a better job of reporting and documenting uses of force by police officers.   In January 2008, police officers were videotaped beating an unconscious man. Seventeen officers failed to report this incident.   When revealed later, one supervising officer was reprimanded for failing to report the incident, and that officer has since been promoted.   Five police officers were terminated by the City, but reinstated by the Jefferson County Personnel Board.

Davis had only one complaint of excessive force against him prior to the events giving rise to the instant case.   Hai Luu made the complaint in December 2009, alleging that Davis kicked and slammed him to the ground during an arrest.   Jail personnel noted Luu had injuries and sent him to Cooper Green Hospital, where he was told that he had a cracked vertebra.   (Doc. 58-2, pp. 50-51).   Davis failed to complete the necessary reports for his use of force in that incident.

10

Davis was deposed on July 26, 2012, at which time he was on leave for investigation of an incident that occurred in March 2011 (after the incident involving plaintiff).   At the time of his deposition, Davis had not received anything from the IAD reflecting whether the excessive force complaint filed in 2011 was sustained.   Davis testified that, as of the date of his deposition, he had never been disciplined by the BPD.

The BPD uses an "Internal Affairs Early Warning System," to keep superior officers and the Internal Affairs Department ("IAD") abreast of any issues the officers may be having.   The system places a flag in a police officer's file when any addition is made to the file in a 365-day cycle.   The additions may be negative, positive, or purely informational. When an officer has three flags, the IAD will receive an alert the next time the file is opened (on the fourth flag).   The IAD then sends an e-mail notice of the fourth flag and, depending on the nature of flag, investigates or sends the issue to the precinct for investigation.[10]   Between 2007 and 2010, twelve officers had at least 4 early warning flags; twelve officers had at least 5; six officers had at least 6; five officers had at least 7; five officers had at least 8; four officers had at least 9; two officers had at least 11; one officer had at least 16; and 74 "unknown" officers had between 8 and 23 early warning flags.   In 2007, 122 Early Warning Reports were generated regarding Use of Force; in

---

[10]   There is conflicting testimony as to whether the IAD sends notice of the flag directly to the officer in question or to the officer's supervisor.   Testimony from Officer Davis's superior, Sergeant Jones, indicated that she has never received an IAD alert or inquiry about an officer, but other evidence suggest that the procedure calls for the alert or notice to go to supervisors of the officer in question.

2008, 204 were generated; in 2009, 179 were generated; in 2010, from January through July 8th, 105 were generated.

The IAD investigates citizen complaints of excessive force by police officers. These investigations are triggered only by the filing of a formal 131 complaint with IAD, either by a citizen or another police officer. Although formal 131 complaints can be initiated by telephone, in person, or by letter written to the police department, the complainant must sign the complaint before an investigation commences.[11] Officers under investigation may or may not be notified of the investigation by the IAD. Although BPD policy requires completing IAD investigations within 45 days, fifty-six percent (56%) of the investigations initiated in 2007 were not completed on time and seventy-three percent (73%) of those initiated in 2010 were not completed within 45 days. From 2007 to 2010, out of 115 formal Form 131 complaint investigations initiated, twelve (12) resulted in discipline to the officer involved.

Birmingham Police Department policy requires a Use of Force report any time force is used to make an arrest.[12] In 2007, BPD made 26,801 arrests, on which 514 Use of Force

---

[11]  Complaints of excessive force in the form of Notices of Claim to the City or even federal law suits do not result in an IAD investigation unless a formal 131 complaint is signed and filed.

[12]  There is a conflict in the testimony concerning when a Use of Force report is required. Officer Davis testified that no report is necessary unless a "fight" occurs during the arrest. Officer Boockhodt testified, however, that a Use of Force report is required any time an officer is requires to "put their hands on somebody" even if just a touching. Section 113-3 of the Birmingham Rules and Regulations regarding Use of Force Reports states: "Whenever the use of force is necessary to effect an arrest, to stop potentially dangerous and unlawful behavior, to protect the officer or another from injury, to protect subjects from injuring themselves or when attempting to detain a subject, the officers involved shall immediately report such facts to their

reports were made.   In 2008, 30,591 arrests were made, of which 388 resulted in Use of Force reports being filed.   In 2009, BPD made 30,465 arrests with 401 Use of Force reports being filed.   From 2007 to 2012, there were a total of 2,449 Use of Force reports filed.   Of these, 2,366 were found to be consistent with the police department's policy regarding use of force, 72 resulted in no finding at all, and one was found to involve excessive force.

Birmingham police officers receive training though the Birmingham Police Academy, consisting of 800 hours of training, almost twice that required by the Alabama Police Officer Standards and Training Commission ("APOST").   All officers graduating from the Birmingham Police Academy are certified by the APOST.   This training involves police tactics, investigation, and use-of-force standards.   The rules and regulations of the Birmingham Police Department concerning the use of force are covered in the training. Following graduation from the Police Academy, new officers are assigned a Field Training Officer for a 16-week course of instruction on the job by a veteran police officer.

---

supervisor and/or superior officer."   The language used in the regulation seems inconsistent with the requirement expressed by Officer Boockhodt.   Indeed, almost every time an arrest is made, the officer is required to "put hands on" the arrestee, even if simply to apply handcuffs.   This construction of the regulation would require the filing of tens of thousands of Use of Force reports, even when the "force" used was nothing more than applying handcuffs or guiding the arrestee with a hand on the arm.

<u>**DISCUSSION**</u>

**I.   § 1983 Claims**

    **A.   Qualified Immunity of Davis**

        Plaintiff's claims set forth as Counts I and II, for unlawful arrest without probable cause and use of excessive force in making the arrest, arise under 42 U.S.C. § 1983, which provides a right of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" when the deprivation is caused by anyone acting under color of state law.   Essentially, Plaintiff asserts that she was unlawfully arrested while clearing off her property, and that Davis employed excessive force in effectuating the arrest.

        Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit and liability where their conduct does not violate "clearly established statutory or constitutional rights."   <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).   The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are carried out through means that are within the official's authority to utilize.   <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265-66 (11th Cir. 2004), quoting <u>Hill v. DeKalb Reg'l Youth Detention Ctr.</u>, 40 F.3d 1176, 1185 n. 17 (11th Cir. 1994).   Furthermore, it is the general rule that qualified immunity will protect government

actors from liability, and only in "exceptional cases" will the immunity be unavailable as a shield.   Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).   Even so, qualified immunity does not apply in those instances where the case law establishes a "bright line" in such a "concrete and factually defined context" to make it obvious to all reasonable government actors, in the defendant's position, that the actions violate federal law.   Scarbrough v. Myles, 245 F.3d 1299, 1301 (11th Cir. 2001).

The initial burden of demonstrating that the public official is acting within the scope of his position lies with the defendant asserting that defense.   Holloman, 370 F.3d at 1264. The test is not whether the defendant had the authority to effectuate an illegal act, but whether their jobs entailed engaging in the act in general.   See id. at 1266.   In other words, the court does not ask whether the defendant had the right to illegally arrest the plaintiff, or to use excessive force against the plaintiff, but simply whether making arrests was within the general scope of the officer's duties.   The answer, of course, is in the affirmative.

Once the defendant has met this burden, which Davis has done, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.   Id.   To prevail against an assertion of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."   Id. at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 119 S. Ct. 1692, 1697, 143 L. Ed. 2d 818 (1999).

### 1. Count I - Unlawful Arrest by Davis

In Count I of the complaint, Plaintiff argues that Davis conducted an unlawful and unwarranted arrest in violation of Plaintiff's constitutional right to be free from unlawful search and seizure when he arrested her and physically assaulted her.   Davis appears to be the only defendant sued in Count I.   Plaintiff claims she posed no threat to the officer or any members of the community, nor was she involved in any criminal activity.   She claims that there was no probable cause for her arrest.   As the Eleventh Circuit Court of Appeals explained concerning an alleged illegal arrest in Von Stein v. Brescher, 904 F.2d 572 (1990), law enforcement officials will sometimes "mistakenly conclude that probable cause" exists, but in those instances the officials still are shielded by qualified immunity. Id. at 579, citing Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

An arrest without a warrant and lacking probable cause violates the constitution and can support a claim pursuant to 42 U.S.C. § 1983, but the existence of probable cause at the time of arrest is an absolute bar to such a claim.   Brown v. City of Huntsville, Ala., 608 F.3d 724, 734 (11th Cir. 2010) (citing Case v. Eslinger, 555 F.3d 1317, 1326-27 (11th Cir. 2009); Kingsland v. City of Miami, 382 F.3d 1220, 1226, 1232 (11th Cir. 2004); Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996)).   The issue is whether there existed at the time "arguable" probable cause.   See Von Stein, 904 F.2d at 579, and cases cited therein.   Actual probable cause need not be proved, but only "whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."   Wood v. Kesler, 323 F.3d 872, 878 (11th Cir.

2003), cert. denied, 124 S. Ct. 128, 157 L. Ed. 2d 143 (2003).   "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."   323 F.3d at 878, quoting Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991).

The question, therefore, is whether Davis could reasonably (even if mistakenly) have believed that plaintiff's behavior at the point she was arrested constituted disorderly conduct under Alabama Code §13A-11-7, infra.   Taking Plaintiff's version of the facts as true, she had not engaged in any of the behavior outlined in Alabama's Disorderly Conduct statute.   She explicitly denies fighting, scratching, or creating tumult, and there is no assertion that she disrupted a public meeting or gathering or obstructed vehicle traffic.   When her father was placed under arrest, she placed her hands behind her back, anticipating that she too would be placed under arrest.   Defendants' version of the facts varies widely from this account, but that variation only strengthens the conclusion that there is a dispute of material fact as to whether Davis had probable cause to place plaintiff under arrest.[13]   Plaintiff's right to be free from arrest without probable cause was clearly established at the relevant time.   Accordingly, Davis is not shielded by

---

[13]  If it is argued that Davis had arguable probable cause to arrest the plaintiff for "criminal littering," there remains a fact dispute.  According to the best statement of plaintiff's evidence, she had not yet placed any trash in the alley at the time she was arrested.  Because criminal littering is a Class C misdemeanor, see Ala. Code § 13A-7-29(d) (Cumul. Supp. 2012), Davis had to witness the violation before probable cause, arguable or otherwise, would exist.  Plaintiff's evidence shows that she was arrested before any littering occurred.

qualified immunity, and his motion for summary judgment as to Count I is due to be DENIED.

## 2. Count II - Excessive Force Exercised by Davis[14]

To establish a claim for use of excessive force in violation of the Fourth Amendment, the plaintiff is required to present evidence from which a reasonable jury could conclude that the force used against her in effectuating the arrest and after she was handcuffed was "objectively unreasonable," that is, whether a reasonable officer in the same situation would have believed that the force used was excessive.   Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).   "Whether the force used is reasonable turns on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989)); see also Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997).

The United States Supreme Court has recognized that officials can be on notice that their conduct violates federal law, even in novel situations.   Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct.   2508, 153 L. Ed. 2d 666 (2002).   The test is whether the state of the law at the time of the incident made the basis of the complaint gave the defendant "fair warning" that his conduct was unconstitutional.   Id.

---

14   Although not completely clear, the court reads Count II as suing Davis both in his individual capacity and his official capacity.   Under the latter, the court construes this count as asserting a claim against Davis's employer, the City of Birmingham, as well as Davis.   The City's potential liability is discussed later in this Memorandum Opinion.

Plaintiff does not cite any cases that demonstrate that there exists clearly established federal law that would prohibit the alleged conduct -- choking the plaintiff, punching her in the face, and slamming her on the ground multiple time before she was handcuffed, and then ripping out her hairpiece and spraying her with mace after she has been handcuffed. However, the Eleventh Circuit has articulated an exception to the rule that there must be a case precisely on-point in order for the plaintiff to prove that a clearly established right was violated.   The Eleventh Circuit has said:

> A narrow exception exists to the rule requiring particularized case law to establish clearly the law in excessive force cases.   When an excessive force plaintiff shows "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the official is not entitled to the defense of qualified immunity.   *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997); *see also United States v. Lanier*, 520 U.S. 259, 117 S. Ct. 1219, 1227-28, 137 L. Ed. 2d 432 (1997) ("[t]he easiest cases don't even arise.   There has never been ... a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability")(citations omitted); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992)("It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books.").

> To come within the narrow exception, a plaintiff must show that the official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point."   *See Smith*, 127 F.3d at 1419.   This test entails determining whether "application of the [excessive force] standard would inevitably lead every reasonable officer in [the Defendants'] position to conclude the force was unlawful."   *See Post v. City of Fort Lauderdale*, 7 F.3d

1552, 1559 (11th Cir. 1993), *as amended*, 14 F.3d 583 (11th Cir. 1994); *see also Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997).

Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926-27 (11th Cir. 2000); see also Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002); Hadley v. Gutierrez, 526 F.3d 1324 (11th Cir. 2008); Fils v. City of Aventura, 647 F.3d 1272 (11th Cir. 2011). When taking the facts in the light most favorable to the non-moving plaintiff, Davis's conduct prior to restraining plaintiff comes within this narrow exception. According to plaintiff, she was standing with her hands behind her back where Davis could see them. Davis ran around to face plaintiff and began choking her. He then punched her in the face and "body slammed" her onto the ground three times, rolled her around on the ground, and wrenched her arm up behind her back to the point of injury before handcuffing her. Plaintiff did not have any weapons and had not taken any action that indicated that she was a threat to herself, Davis, or anyone else. In fact, plaintiff preemptively complied with Davis when he arrested her father by putting her hands behind her back before she was even asked to. Under these circumstances, Davis had to know that he was violating the constitution by choking, punching, and slamming to the ground an unarmed, non-threatening person who was roughly four inches shorter and fifty pounds lighter than he. Accordingly, Davis is not shielded by qualified immunity.

In regards to Davis's actions after plaintiff had been handcuffed -- yanking out her hairpiece and spraying her in the face with pepper spray three times -- the court is aware of

cases that hold that the use of force after the arrestee is restrained can be deemed a constitutional violation.   The court considers Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997), and Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1998), in which non-threatening persons were injured by police effecting an arrest with unnecessary force.   See also Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998).   In Smith, a suspect who had initially threatened an officer with a baseball bat surrendered to a pursuing officer. The officer then broke the suspect's arm while he lay face-down being handcuffed.   Even though the initial use of force was warranted by the threatening act of the suspect, once he submitted to authority and ceased to resist, the need for the use of force and the degree of force proper under the circumstances diminished greatly.   Similarly, in Sheth, an officer slammed a non-threatening female motel owner into a vending machine while arresting her without cause.   The events in both these cases occurred in or before 1994,[15] predating the arrest in the instant case by sixteen years, yet the court of appeals concluded that the law was sufficiently well-established in 1994 that neither of the officers involved in those cases could claim the benefit of qualified immunity.   It must follow, of course, that if the law was clearly established in 1994 for purposes of Smith and Sheth, it also was clearly established in 2010, when the events resulting in the instant case occurred.

---

[15]   Although the reported opinion in Smith does not reveal the date of the events in that case, the court notes that the district court case had a "94" case number, indicating that the complaint commencing the case was filed in 1994.   The events underlying the complaint, of course, occurred before that time.

The version of the facts offered by plaintiff establishes the objective unreasonableness of the force used after she was handcuffed.   While Defendants disagree with plaintiff's description of the events, this does nothing more than prove the existence of a genuine issue of fact that precludes summary judgment.   The facts and circumstances, viewed most favorably for plaintiff, reveal that Davis already had handcuffed her (and had exhibited excessive force in doing so), and she was sitting on the ground, talking on a cellphone to her sister.   A reasonable officer simply would not perceive plaintiff as a threat to do serious bodily injury to anyone on the scene.   Previous case law gave any reasonable officer fair warning that inflicting injury on a non-threatening person who was already handcuffed is illegal.   This scenario, if accepted as true by a jury, would warrant the finding of a constitutional violation.   Accordingly, the shield of qualified immunity is not available to Davis under these circumstances, and the motion for summary judgment on Count II is due to be DENIED.

### B.   Immunity of A.C. Roper

Counts III and IV of the complaint assert claims against A.C. Roper only in his official capacity as the Chief of Police for the City of Birmingham.   (Doc. 53, p. 16).   The claims against Roper in his official capacity are essentially claims against his employer, the City of Birmingham.   See Will v. Michigan Department of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office," and, "[a]s such, it is no different from a suit against the state itself."); Cooper v.

Dillon, 403 F.3d 1208, 1221 n. 8 (11th Cir. 2005); Simmons v. Conger, 86 F.3d 1080 (11th

Cir. 1996).   It is clear that under Kentucky v. Graham, official capacity lawsuits are "only

another way of pleading an action against the entity."   473 U.S. 159, 165-66, 105 S. Ct.

3099, 87 L. Ed. 2d 114 (1985).   In this case, the City of Birmingham also is a defendant,

and the claims against Roper in his official capacity are duplicative.   Any relief Plaintiff

seeks against Roper in his official capacity may be obtained through her claims against the

City.   Accordingly, the motion for summary judgment on all claims against Roper in his

official capacity is due to be GRANTED as redundant of the claims against the City.

### C.   Liability of the Municipality - Count III Inadequate Training and Supervision, and Count IV Deliberate Indifference Through Custom

It is well-settled that a municipality cannot be liable for a constitutional tort under

§ 1983 unless the deprivation of the constitutional right occurred as a result of an official

policy or custom of the governmental body.   See Monell v. Department of Social Services

of New York, 436 U.S. 658, 690-691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).

Moreover, "a municipality cannot be held liable under § 1983 on a *respondeat superior*

theory."   Id. at 691.   The Eleventh Circuit Court of Appeals has further determined that a

municipality may be liable under § 1983 for the actions of a police officer only when the

city's "official policy caused the violation."   Gold v. City of Miami, 151 F.3d 1346, 1350

(11th Cir. 1998).

In order to survive summary judgment on the § 1983 claims, the plaintiff must have

come forward with evidence to show that the City had a policy -- even if unwritten and

informal -- of perpetuating unlawful or illegal arrests or of applying excessive force in effectuating arrests.   Plaintiff argues that the actions or, in some cases, the failure to act, of the City has created "an atmosphere of abusive behavior, tolerance of that behavior, and a lack of accountability on every level."   (Doc. 53, p. 13).   In Count III of the complaint, plaintiff claims that the City of Birmingham has a policy and/or custom of inadequately supervising and training officers which results in officers using excessive force without fear of consequences.   In Count IV of the complaint, she alleges that the City's continued tolerance of repeated use of excessive force and illegal seizures of Birmingham citizens by BPD officers without sufficient, if any, corrective action has amounted to deliberate indifference to the rights of persons with whom the Defendants come into contact.

Where the plaintiff's theory of municipal liability rests on the City's alleged failure to adequately train and/or supervise its officers, the plaintiff must show a "deliberate choice" by the City not to train or supervise officers despite notice of the need to do so. The Eleventh Circuit reiterated this standard only three years ago, saying:

> A municipality can also be held liable under § 1983 when its employees cause a constitutional injury as a result of the municipality's policy- or custom-based failure to adequately train or supervise its employees.   *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). But "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."   *City of Canton*, 489 U.S. at 388, 109 S. Ct. 1197.   To establish a municipality's "deliberate indifference," a plaintiff must put forward some evidence that the municipality was aware of the need to train or supervise its employees in a particular area.   *Gold*, 151 F.3d at 1350–51.

Establishing notice of a need to train or supervise is difficult.  A plaintiff may demonstrate notice by showing a "widespread pattern of prior abuse" or even a single earlier constitutional violation.  *Gold*, 151 F.3d at 1351.  But a plaintiff must also demonstrate that constitutional violations were likely to recur without training.  *Id.* at 1352 n. 12.  In some cases, the need for training is so obvious that deliberate indifference can be established even without an earlier violation or pattern of abuse.  *Brown*, 520 U.S. at 409, 117 S. Ct. 1382.  Still, it must have been obvious that the municipality's failure to train or supervise its employees would result in a constitutional violation. *Id*.  In addition to notice, a plaintiff must also establish that the city "made a deliberate choice" not to train its employees. *Gold*, 151 F.3d at 1350.

American Federation of Labor & Congress of Industrial Organizations v. City of Miami, FL, 637 F.3d 1178, 1188-89 (11th Cir. 2011).   Under this standard, it is "difficult" for a plaintiff to extend liability to the City. Plaintiff acknowledges that the City has articulated policies against the use of excessive force and standards for the use of force.  She admits that the City has a mechanism for investigating and disciplining officers accused of excessive force, although she asserts that mechanism is routinely ignored.  Below, the court examines whether the plaintiff has mustered enough evidence to create a dispute of fact as to whether the City has made the "deliberate choice" to forgo training of its officers even though knowing of widespread constitutional abuses by them.

### 1. Failure to Supervise - Generally

Plaintiff cites a report regarding an event in 2008, in which a videotape of a chase involving the Narcotics Unit shows five officers using excessive force on Anthony Warren after he was ejected from his vehicle during a crash.   The report states "[d]uring the course of the investigation, it was revealed that the supervisor failed to properly supervise the

officers by filling out the proper paperwork, notifying supervisors [of the officers involved], and getting pictures of the officers and the suspect.    Therefore, it is recommended that this charge be classified as sustained."    (Doc. 62-6, p. 6).    The report also stated that "the Narcotics Unit as a whole failed to follow the Rules and Regulations set out by the Department as to filling out the proper paperwork and forwarding it through the Chain of Command which will notify the Chief of incidents such as this."    (Id.) Plaintiff alleges that no officers have been permanently discharged for the 2008 Warren incident and that the supervisor involved was actually promoted from Lieutenant to Captain over the entire precinct between 2008 and 2010.    Plaintiff alleges that this report, in conjunction with the instant case and the Hai Luu incident in 2009, indicate a systemic failure of supervision.    Plaintiff also claims that the supervisor in the Warren incident was one of the supervisors at the time of the instant incident and at the time of the Hai Luu incident.

Plaintiff contends that due to BPD's failure to properly utilize its Internal Affairs Early Warning System ("Warning System"), the police department and, through it, the City itself, was unaware that, between July 2007 and 2010, 12 officers had at least 4 early warning flags, 12 had at least 5, 6 had at least 6, 5 had at least 7, 5 had at least 8, 4 had at least 9, 2 had at least 11, 1 had at least 16, and 74 "unknown" officers had between 8 and 23 early warning flags; in 2007, 122 Early Warning Reports were generated regarding Use of Force; in 2008, 204 were generated; in 2009, 179 were generated; in 2010, from January through July 8, 105 were generated.    These numbers, however, do not indicate which

reports regarding use of force were ultimately determined to have merit.   They also do not indicate that all supervisors were negligent in their investigation and utilization of the Warning System.   Because the Early Warning System is designed to identify potential problem officers, it is unclear whether these reports over-report instances of uses of force involving relatively minor events.   The point is simply that little if anything probative can be gleaned from these raw numbers.

Defendants answer Plaintiff's claim that the supervisor involved in the 2008 Anthony Warren incident was promoted by pointing to testimony that he was first disciplined with respect to his failure to report.[16]   BPD also terminated the employment of all five officers involved in the 2008 Warren incident and reinstated them only after the Jefferson County Personnel Board reversed the terminations.   The City contends that there is no evidence of widespread abuses that would have served to put the City on notice of a need to retrain and discipline, and there is no evidence that the City made the deliberate choice not to implement retraining and discipline.   Indeed, the plaintiff's evidence on this point ultimately rests on four incidents: the 2008 Warren incident, the 2009 Hai Luu incident, plaintiff's confrontation with Officer Davis in 2010, and a 2011 arrest Tavarus Daniel.   This hardly establishes such widespread abuse as to make the City's training and supervision decisions tantamount to deliberate indifference.

---

[16]   Roper testified that the supervisor was given 15 days' probation for failure to notify the Commanding Officer of IAD of what he saw in the videotape.   (Doc. 61-2, p. 24).

Defendants also contend that plaintiff's evidence fails to show that the alleged violations regarding completing reports and following internal administrative procedures are "highly likely" to result in the use of excessive force or an unlawful search and seizure by Davis or any other BPD officer.   The raw statistical evidence concerning the number of Use of Force reports in relation to the number of arrests occurring each year, in the absence of some context or expert explanation, simply fails to present anything probative on the question of whether the City is on notice of a need for more supervision or training. Whether 388 Use of Force reports out of over 30,000 arrests is a large or small number is unclear without some expert context.   While plaintiff argues this number proves to a "reasonable person" that uses of force are being underreported, the court has no way of knowing this, even at the risk of seeming unreasonable.   First, the court does not know whether, relative the number of arrests, this is regarded as an unusually small number of uses of force or about average or excessive.   This requires some expert explication, without which the court and a jury can only speculate as to its significance.   Second, even if it is a low number, it may indicate just as plausibly as the plaintiff's underreporting theory that the City's training on uses of force has successfully *reduced* the incidents of force.   Which understanding of these numbers is correct is anyone's guess.   The raw number simply is not probative.

The same is true of the Early Warning System statistics: without expert explication, they are not probative of anything.   That a certain number of officers received Early Warning notices over a period of time does not by itself establish whether a problem exists

with use of excessive force.   Under plaintiff's evidence, 47 officers received an Early Warning notice over a three and half year period.   Relative to the size of the police force, the court cannot say whether this is probative of widespread abuse or is merely average (or even low) for a police force of that size.   Again, the raw number simply is not probative.

## 2. Failure to Supervise Davis

Plaintiff alleges that Davis's supervisors failed to properly monitor his actions and respond to warning signs.   Jones, Davis's immediate supervisor at the time of the events giving rise to the instant case, testified that she never discussed Plaintiff's allegations against Davis or reviewed Plaintiff's arrest report (until the time of her deposition). (Doc. 58-1, p. 17).   Jones claimed that it was not her "duty" to attempt to investigate complaints against the officers she supervises, and that she does not review an officer's IAD statement regarding excessive use of force or do any review of the behavior of officers she supervises.   (Id. at 16, 18, 21).   Jones stated in her deposition that she did not know how many times Davis had been in trouble for excessive force.   (Id. at 18).

However, Lieutenant Dennis Shepherd, the head of the IAD, testified that it is an officer's "first line supervisor's" job to determine whether an officer's IAD form is correctly filled out, requiring some knowledge of what occurred when the officer used force in effectuating an arrest.   (Doc. 58-4, p. 22).   Further, if the form is not filled out correctly, the first line supervisor should ensure that corrective action is taken.   (Id.)   It was also the Precinct Captain's responsibility to ensure that all paperwork was done correctly.   (Id. at 29).   Neither Davis, Jones, nor Captain McCaskey, the precinct captain

at the time of the events giving rise to the instant case, were punished or retrained regarding paperwork failure, and the first instance that Shepherd knew that Davis's IAD form concerning his use of force on Fannett was not complete was on the day of his deposition - two and a half years after the incident.   (Id. at 23).   Plaintiff alleges that Davis also was not reprimanded for failing to properly report his use of force in regards to the Hai Luu incident.[17]

Plaintiff asserts that the City of Birmingham's "Internal Affairs Early Warning System," although in existence, is not used.   According to Shepherd, when the IAD receives an alert, an email is sent to the officer's supervisor, to which the supervisor responds.   (Doc. 58-4, p. 10).   Copies of both emails are placed in the officer's IAD file. (Id.)   However, Jones testified that she had never reviewed Davis's IAD reports and did not know if or how many times Davis had been in trouble for using excessive force. (Doc. 58-1, p. 18).   Jones testified that the IAD warning letters are, contrary to Shepherd's testimony, sent directly to the officer in question, not to his or her supervisor.   (Id.)   Jones testified that, although it is part of her job to evaluate the officers she supervises, she does not ever ask IAD about any trouble the officers have been in, and does not consider it a part of her job to do so.   (Id. at 18-19).   The City maintains that the Early Warning System operated as intended because "the claim of excessive force was entered into the IAD system; the system issued an alert; and an investigation into the allegations was initiated."

---

[17]   Plaintiff also cites an incident that took place in 2011 regarding Davis; however, an incident that occurred after the events giving rise to the instant claim cannot be used to show that BPD had notice that Davis needed to be retrained or supervised more closely.

That there appears to be a breakdown in the supervision of Davis by Sergeant Jones and perhaps Captain McCaskey does not mean that *the City* or Chief Roper was deliberately indifferent to the need to supervise or train Davis.   The City and Chief Roper put into place various rules, regulations, and systems designed and intended to provide oversight and supervision of police officers.   Without evidence that there was a *widespread* misuse of these systems by many police supervisors, the fact that two supervisors failed to carry out their supervisory duties does not prove that the City or Chief Roper accepted this breakdown as the customary policy of the police department.   For such to amount to City policy for purposes of § 1983 liability, the evidence must be such that a reasonable jury could infer that the City both knew about the breakdown in supervision and that it or Chief Roper was deliberately indifferent to the need to correct the problem.   There is no evidence that the City or Chief Roper knew that Sergeant Jones was failing to review IAD Early Warning alerts or arrest reports and Use of Force reports prepared by Davis.   The City is entitled to assume that its supervisors are following regulations until it becomes clear that they are not.   Unless there is evidence that City or Chief Roper knew that Davis's supervisors were not properly supervising him, it cannot be said that the City endorsed that course of conduct as its policy or custom.

### 3. Failure to Investigate

Plaintiff alleges that it is undisputed that most complaints against BPD officers are not investigated as required by BPD Policy and Procedure.   Plaintiff alleges that Shepard testified that "if there is not a formal 131 IAD complaint filed by an individual or by

another BPD Officer then it is the custom and policy <u>not</u> to conduct an investigation." (Doc. 53, p. 28).   However, the deposition testimony cited to support Plaintiff's allegation does not support that claim.   In the relevant section of Shepard's deposition, he states that he did not begin an IAD investigation upon learning that a citizen filed a lawsuit alleging excessive force by a BPD officer because he did not feel that he was required to do so under Policy and Procedure.   He said he had never attempted to obtain copies of notices of claim filed by citizens with the City prior to filing suit against the City based on behavior by BPD officers and, unless a complaint also is filed with the IAD, he does not investigate the allegations in those notices of claim.

In her deposition, Sergeant Jones testified that if a citizen calls the BPD with an excessive force complaint, she will take a name and number and ask the complainant to come to the precinct to fill out paperwork because "[w]e don't do 131's over the phone." (Doc. 58-1, p. 8).   Jones testified that she does not do a report on complaints made by telephone and, if the complainant is claiming that an officer used excessive force, the complainant would "need to come into the precinct and make a complaint."   (<u>Id.</u>)   She testified that she would talk to the officer about the complaint "[b]ut if [the citizen] don't [sic] come ... in to the office ... and talk about it or tell me what's going on, I can't investigate it, or it don't go up.   No, it don't go up [to IAD]."   (<u>Id.</u>)   It appears that, despite the fact that it is a supervisor's duty to investigate "all alleged or suspected violations of laws, . .   reported by a citizen in person, by telephone or by correspondence,"

if a 131 form is not filled out in the precinct, the complaint will not reach IAD for further investigation, at least not through Jones.

Plaintiff contends that Catherine Guinn, an employee of the City of Birmingham who works for IAD, testified that in order for an investigation to be done, an individual must come in and sign a formal 131 form.[18]   Again, Guinn's testimony does not quite support Plaintiff's allegation.   Guinn stated that IAD does not initiate investigations based on notices of complaint filed with the City but that, "[i]f there is a complaint whereas the officer used excessive force filed by the complainant, he comes in and signs a formal complaint," then an IAD investigation is conducted.   (Doc. 60-8, p. 15).   The context of Guinn's testimony does not necessarily indicate that it would *not* be acceptable for a citizen to file a formal complaint by letter.   Her testimony may indicate that a telephone complaint would not trigger an investigation because it would not be "signed," but the testimony is not clear or explicit to that point.

Plaintiff also claims that the fact that officers sometimes are investigated by IAD without being informed that a claim has been filed against them indicates a failure to investigate.   Davis testified in his deposition that in some cases the IAD does not inform the officer that a complaint has been filed against him, stating that IAD does "their own investigation and make[s] their own decision."   (Doc. 58-2, p. 47).   However, whether IAD tells the officer he is being investigated does not speak to whether there is an

---

[18]   This testimony was taken in the case styled <u>Blanchard v. City of Birmingham</u>, 2:10-cv-2250.   The events giving rise to the <u>Blanchard</u> case occurred in 2009.

investigation taking place.  Plaintiff further alleges that BPD's failure to implement corrective action due to Davis's cursing at plaintiff (to which he admits) indicates a pattern of poorly run and sloppy investigations that rise to the level of deliberate indifference on the part of the City.  Even if true in this case, an isolated breakdown in the investigative scheme does not mean that the City or Chief Roper were or are deliberately indifferent to the problem.  Evidence of a much more widespread systemic breakdown is necessary before it can be said the City or Chief Roper are indifferent to the inadequacy of investigations by IAD.

Plaintiff contends that the investigation Defendants claim to have undertaken following plaintiff's filing of a 131 complaint form was based only on one witness's testimony, and Mr. Thompson was not interviewed regarding what he saw.  Sheppard testified that Davis was exonerated based on the testimony of one witness (Mr. McGinnis) and Davis's own statement.  (Doc. 58-4, p. 18).  Mr. McGinnis, however, stated that, although he remembered speaking to a police officer at the scene on the day of the incident, he does not remember going to the police officer and giving a sworn statement.  (Doc. 60-6, p. 12).  He was shown a transcribed statement during his deposition and still did not remember going to the police station or giving the statement at all.  (Id.)  It appears that plaintiff is insinuating that the Mr. McGinnis's transcribed statement may be falsified; however, other than Mr. McGinnis not remembering having made the statement, plaintiff has not provided any evidence that the statement is falsified or alleging that other statements have been falsified in other cases.  Sheppard believes that Mr. Thompson was

interviewed, but no statement from Mr. Thompson has been produced. (Id.)   Also, even though multiple neighbors came out of their homes during the encounter between Fannett and Davis (doc. 58-3, p. 13), none was interviewed.   Sheppard stated that in a proper investigation, statements would have been taken from all witnesses.   (Doc. 58-3, p. 13). Plaintiff alleges that the failure to take a statement from Mr. Thompson or any neighbor other than Mr. McGinnis - who does not even remember making a statement - indicates a pattern of poorly run investigations rising to the level of deliberate indifference.   Again, however, the standard of liability for the City and Chief Roper is deliberate indifference to the need for investigations.   That fact that this investigation was carried out poorly does not prove that the system of investigations put into place by the City and Chief Roper are so inadequate as to be deliberate indifference.   Plaintiff must present substantial evidence of a systemic inadequacy, not simply a single, perhaps isolated investigation poorly done. The City and Chief Roper cannot be said to be deliberately indifferent to the need for fair and adequate investigation of citizen complaints unless they are aware that system-wide the investigations are not fairly and adequately conducted.   Otherwise, every mistake made or poorly conducted investigation, no matter how isolated, translates into the policy and custom of the City.

Plaintiff claims that a history of not closing IAD investigations within the required 45 to 90 days indicates a failure to investigate.   Plaintiff claims that during the reporting period of January 1, 2007 to February 1, 2012, there were 106 cases not "closed" or were noted for "no disposition" after an officer used force during an arrest.   Moreover, statistics

show that, of the formal complaints completed by civilians and investigated between January 2007 and July 2010, fifty-six percent in 2007 were not completed within the mandatory time frame and, in 2010, seventy-three percent of the reports filed in 2010 were not completed within the mandatory time frame.   (Doc. 58-6).   Even if investigations were not completed within a particular time frame, this does not mean that investigations were not conducted or were conducted inadequately.   The fact that many investigations went longer than the 45 to 90 day time limit may indicate the thoroughness of the investigations just as plausibly as it indicates plaintiff's assertion that the investigations were inadequate.   Again, in the absence of some expert explication of the meaning of these numbers, they are not probative of anything, open to whatever interpretation anyone wishes to give them.

Plaintiff also claims that officers completed a Use of Force Report in only two percent of custodial arrests in 2007, despite the fact that BPD Policy requires a report whenever the use of force is necessary to make an arrest.[19]   The court addressed this evidence earlier.   Without some statistical context or expert explication, the court cannot infer from the raw number of Use of Force reports in relation to the total number of arrests that uses of force are being underreported.   Perhaps they are being underreported or

---

[19]   BPD policy, at the relevant time, defined the use of force as "[a]ny force utilized that is greater than verbal or soft hand control technique or the level of control required is a level 4 or greater as defined in section IV of this Procedure."   (Doc. 58-5, p. 1).   Level IV control is defined as "hard empty hand control," examples of which are "kicks, punches, strikes, CS/OC spray, TASER," and is to be used when the subject is exhibiting "Defensive Resistance," described as "pulling or pushing away from the officer."   (Id. at 6).

perhaps Birmingham police are adept at making arrests without using much force. Without context or expert interpretation, the court cannot infer underreporting or an institutional "blind eye" turned toward uses of force.

Plaintiff asserts that it is virtually impossible that only two percent of custodial arrests in 2007 and one percent in 2008 and 2009 required Level IV control.   Plaintiff also argues that, if a proper investigation is being undertaken, that it is similarly unlikely that between 2007 and 2012, of the 2,449 Use of Force Reports completed by BPD officers, 2,366 were found "in policy," 72 had no finding, and only one claim was "sustained" for using excessive force.   Plaintiff argues that this, in conjunction with the minute number of formal Form 131 complaints that resulted in discipline in the years 2007-2009 (three each year and only three in January through July 8, 2010) indicates a practice or custom of letting incidents of excessive force go unpunished.[20]   As explained above, however, the court draws no probative value from these numbers as there is no statistical context or expert explanation of their meaning.   Although plaintiff characterizes the number of officers disciplined due to Form 131 complaints as tiny, about ten percent of all complaints resulted in discipline.   The court has no way of knowing whether this is an average number for a police force the size of Birmingham's, or whether it is small or excessive.

_____

20   An examination of plaintiff's Exhibit M (Doc. 59-3) reveals that from January 2007 to December 31, 2012, the IAD of the Birmingham Police Department investigated 125 complaints of excessive force by various officers.   Of these, no basis for disciplining the officer was found in 111 cases, while officers received some form of discipline in 12 of these complaints.   One remained in "open" status, and one was closed when the officer resigned during the investigation.

37

Without some way of comparing this to other police departments, the court cannot infer anything about BPD's practices.

Plaintiff analogizes these facts to those in <u>Kopf v. Wing</u>, 942 F.2d 265 (4th Cir. 1991), in the Fourth Circuit.[21]   In <u>Kopf</u>, the Fourth Circuit found that the evidence presented by the plaintiff was sufficient that "a fair-minded jury could find that the county has a custom or practice of letting incidents of excessive force go unpunished."   942 F.2d at 269.   The plaintiff in that case had shown,

> numerous particular incidents of excessive force, including one that resulted in a jury verdict against officers and another that was allegedly settled for a large amount.   Appellant also presents statistics showing that the percentage of excessive force complaints sustained through the county's administrative investigation has been minimal *in comparison with the rather large percentage of other citizen complaints that have been sustained.*   Finally, appellant points out that Commander's Information Reports (CIRs), which detail the results of internal investigations into every use of force, including dog bites, are kept for six months and then destroyed. Another county policy forbids taking photographs of dog bites. Appellant argues that these practices create the impression among officers that wrongdoing will not be documented.

<u>Kopf</u>, 942 F.2d at 269 (italics added).   The court in <u>Kopf</u> found significant the comparison of unsustained excessive force complaints to the "rather large percentage" of other types of citizen complaints sustained, inferring from this a scheme to allow excessive force by officers to go unpunished.   No such comparison is presented in the instant case.   As

---

[21]   Although the case is not binding precedent, it is instructive in evaluating how the totality of the evidence can indicate an unconstitutional custom or practice.

explained by the court, the plaintiff's evidence has no statistical context or expert explanation to establish their meaning in this case.

This circuit also allows for the showing of a custom or policy that is "unwritten." Here, plaintiff has pointed to two incidents prior to the instant case (only one of which involved Officer Davis) that she argues put the City on notice that it needed to re-train officers regarding use of force. This is bolstered by evidence of a breakdown in the procedures and chain-of-command for filing and investigating complaints and using the Early Warning System, as well as unexplained statistics relating to excessive force complaints allegedly being under-sustained and not being investigated within the time constraints provided by BPD's own policies. Taken together, she contends that these facts put the City on notice of widespread excessive-force abuses that required more training or supervision by the City. Unlike <u>Kopf</u>, the court does not believe this evidence creates a dispute of fact regarding the City's or Chief Roper's alleged deliberate indifference to problems in the police force. As explained above, two prior incidents of alleged excessive force do not show abuses of such a widespread character as to put the City on notice of a need to retrain or more closely supervise the entire police force as a matter of policy. Likewise, evidence of a breakdown involving only one or two supervisors (Sgt. Jones and Capt. McCaskey) fails to show a systemic, widespread disregard for the BPD's policies concerning reporting and investigating allegations of excessive force. Also, the statistics offered by plaintiff, without context or expert explanation, have little or no probative value because in and of themselves they only invite the court and a jury to speculate about their

meaning.   Is twelve instances of discipline out of 125 investigations of alleged excessive force a lot or a little for a police force the size of Birmingham's?   Is the filing of Use of Force reports in one to two percent of all arrests made by the BPD a lot or a little?   The plaintiff's evidence simply does not allow the court to know the probative significance of these numbers.

### 4. Failure to Train

Plaintiff alleges that the BPD has failed to properly train Davis and other BPD officers in how to use force and report the use of force.   Plaintiff claims that this failure to train results in a custom of officers using excessive force because they are unaware or misinformed about what level of force to use under what circumstances.   A city may be liable for failure to train if they are on notice that the failure to train may result in constitutional violations.   Cities may be put on notice in one of two ways.

> First, if the city is aware that a pattern of constitutional violations exists and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent.   Alternatively, deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious.

Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009)(internal citations omitted)(citing Gold v. City of Miami, 151 F.3d 1346 (11th Cir. 1998)).   Further, when determining whether a city has failed to adequately train, "'the focus must be on the

adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies of a particular officer." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

Plaintiff contends that when the 2008 incident is examined alongside the 2009 Hai Luu incident and the events giving rise to the instant case, it indicates that there is a pattern of constitutional violations by BPD officers and, therefore, the City must be on notice of the need to re-train its officers in proper use of force.   Defendants rightly point out that, at the time of the instant case, Davis had no sustained claims of excessive force against him. There is no evidence that Davis was involved in the 2008 Warren incident, and five of those officers were terminated by the City as result of it.[22]   Defendants claim, therefore, that there cannot be notice because prior claims have not been found to have merit. Although the "merit" or not of other claims of excessive force has some probative value, it is not determinative.   The fundamental problem with plaintiff's evidence in this case simply is that a mere two instances of excessive force, one of which resulted in discipline of the officers involve, simply does not put the City or Chief Roper on notice that the rules, regulations, and procedures in place are inadequate to detect and correct constitutional abuses when they occur.   The court remains mindful that the City and Chief Roper may be liable in this case only if they were *deliberately indifferent* to a known problem directly

---

[22]   Those officers were later reinstated by the Jefferson County Personnel Board on appeal, but that is not attributable to any deficiency on the part of the City to supervise and discipline its officers.

related to the risk of harm plaintiff suffered.   The plaintiff's evidence simply is not substantial enough (as opposed to a mere scintilla) to show such deliberate indifference.

Accordingly, the City's and Chief Roper's motion for summary judgment in regards to Counts III and IV is due to be GRANTED.

## II.   State-Law Claims

Plaintiff is proceeding with state-law claims against only Davis.[23]   (Doc. 53, p. 16). Insofar as state-law claims may have been pleaded against the City or Chief Roper, the plaintiff has expressly abandoned them.   Plaintiff asserts that she was falsely imprisoned (Count VII), assaulted and battered (Count VI), and maliciously prosecuted (Count VIII), all in violation of state law.   Plaintiff further alleges that Davis's conduct constituted the tort of outrage (also known as the tort of intentional infliction of emotional distress) (Count V).   Davis asserts that he is shielded from liability for all state-law claims on the basis of discretionary function immunity under Alabama law.

### A.   Discretionary Function Immunity

According to Alabama Code § 6-5-338(a), a police officer of any municipality in the state "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."   Id.   Discretionary functions have been deemed to be "those acts

---

[23]   Accordingly, defendants A.C. Roper and the City of Birmingham's motion for summary judgment in regard to Plaintiff's state-law claims (Counts V-VIII in the complaint), to the extent that the claims were originally raised against Roper or the City, is due to be GRANTED.

as to which there is no hard and fast rule as to the course of conduct that one must or must not take, and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Moore v. Adams, 754 So. 2d 630, 632 (Ala. 1999), citing Wright v. Wynn, 682 So. 2d 1, 2 (Ala. 1996), and L.S.B. v. Howard, 659 So. 2d 43 (Ala. 1995). The Alabama Supreme Court has held that immunity applies to the conduct of officers in the effectuation of an arrest. See Ex parte City of Montgomery, 758 So. 2d 565, 570 (Ala. 1999).

In Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), the state supreme court set out a detailed test for determining when a state employee is entitled to immunity under § 6-5-338, and changed the focus of such immunity from whether the employee is engaged in a "discretionary function," to the specific provisions of the immunity articulated in Cranman. That restatement of state-agent immunity includes the provision that a state employee is entitled to immunity when "exercising judgment in the enforcement of the criminal laws of the state, including, but not limited to, law enforcement officers' arresting or attempting to arrest persons." 792 So. 2d at 205. Since Cranman, a peace officer's entitlement to immunity under § 6-5-338(a) is judged by the principles set forth in Cranman, and not under an analysis of discretionary versus ministerial functions.[24] Ex parte City of Tuskegee, 932 So. 2d 895, 904 (Ala. 2005).

---

[24] It should be noted, however, that even before Cranman, the state courts recognized that discretionary functions were akin to those that required the exercise of judgment. Ex parte City of Tuskegee, 932 So. 2d at 905, citing Ex parte City of Montgomery, 758 So. 2d at 569.

The statutory immunity extends not only to the officers, but to the governmental unit that employs them.   See, e.g., Howard v. City of Atmore, 887 So. 2d 201, 211 (Ala. 2003); Montgomery v. City of Montgomery, 732 So. 2d 305 (Ala. Civ. App. 1999) (holding that both the officer and the city were immune under § 6-5-338 for mistaken arrest of man). The immunity shields the officers and the city from liability "unless [the] actions were conducted with willful or malicious intent or in bad faith."   Ex parte City of Montgomery, 758 So. 2d at 570.   Accordingly, the court evaluates a claim of discretionary function immunity by first determining whether the defendant has demonstrated that he was exercising judgment in arresting or attempting to arrest the plaintiffs when the alleged wrongful conduct occurred.   If so, the burden shifts to the plaintiff to prove that the defendant acted in "bad faith, with malice or willfulness." Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003).[25]   Davis was exercising judgment in arresting plaintiff, so the court's analysis of each state-law claim will turn on whether a reasonable jury could find that he acted in bad faith, with malice, or with willfulness. Each state-law claim will be analyzed under its unique state-law elements.

### B.   Count V - Tort of Outrage

In Count V of the complaint, Plaintiff contends that Davis's actions "were willful, malicious, and intentional as to inflict terror and trauma upon Birmingham citizens," and

---

[25]   It has been noted that discretionary function immunity and qualified immunity both involve a "core issue" of whether a defendant violated clearly established law.   Qualified immunity, however, cannot be defeated by a showing of bad faith, malice, or willfulness. Scarbrough v. Myles, 245 F.3d 1299, 1303 n.9 (11th Cir. 2001).

that "[t]he emotional distress caused by the defendants was so severe that no reasonable person could or should be expected to endure it."   The elements of the tort, upon which the plaintiff must offer evidence, are the following:

> "The tort of outrage requires that: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) ... the distress was severe.   With respect to the conduct element, this Court has stated that the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'"

Thomas v. Williams, 21 So. 3d 1234, 1237-38 (Ala. Civ. App. 2008), quoting Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1988)); see also American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980).   "[T]he tort of outrage is 'a limited remedy to be applied only in flagrantly egregious circumstances.'"   Gunter v. Huddle, 724 So. 2d 544, 547 (Ala. Civ. App. 1988)(quoting Turner v. Hayes, 719 So.2d 1184, 1187 (Ala. Civ. App. 1997)), aff'd in pertinent part, 719 So. 2d 1190 (Ala. 1998).

It appears to be an open question in Alabama whether a single act can be both an assault and battery *and* an outrageous intentional infliction of emotional distress. Alabama case law recognizes that a *sexual* assault can be both torts, see Harrelson v. R.J., 882 So. 2d 317 (Ala. 2003), but there appear to be no reported cases finding that a *non-sexual* assault and battery may also be an intentional infliction of emotional distress. Judge Thompson observed in K.M. v. Alabama Department of Youth Services, 360 F.

Supp. 2d 1253, 1260 (M.D. Ala. 2005) (a sexual assault case) that some courts have recognized the tort of outrage in the context of a rape or sexual assault, as Alabama does, but that "[o]ther courts have refused to allow a claim of outrage when the facts fit into a more traditional common-law tort regime, such as assault and battery. These courts reason that the tort of outrage was intended to be a 'gap filler' in tort law, allowing for plaintiffs to recover only when they were unable to do so under traditional common-law actions." Id. at 1260.   Absent better guidance from state law, the court believes Alabama would recognize the tort of outrage applicable to especially egregious non-sexual assaults, such as the one alleged here.   The gravamen of the tort is the intentional infliction of emotional distress.   Certainly a terrifying and painful beating at the hands of a person in authority, such as a police officer, has the great potential for causing just such emotional distress above and beyond the physical pain suffered.   While it might be argued that an ordinary fight between private persons might not rise to the level of being sufficiently "outrageous" to support the tort, an assault by a police officer, a person sworn to protect citizens and maintain peace and order, is on a different level.   The abuse of authority inherent in an unlawful assault by a police officer makes it outrageous for purposes of the tort of outrage.

Taking the facts in the light most favorable to the nonmoving plaintiff, there is at least a question of material fact as to whether Davis intended to inflict emotional distress or knew or should have known that emotional distress was likely to result from his conduct. In the course of effectuating the arrest of someone who is not resisting, physical assault and verbal threats such as "bitch, I'll break your fucking arm," can be construed as malicious.

46

Further, although it is not disputed that police officers may use force, when necessary, to effectuate an arrest, there is at least a question of material fact as to whether using the force described by Plaintiff when the arrestee is not resisting is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." It is not disputed that Davis was the arresting officer and, therefore, the person whose actions caused Plaintiff's distress. Plaintiff claims that, not only did she have severe bruising and a wrist injury that required surgery, but she also has been treated with medication for depression and anxiety as a result of Davis's actions. A reasonable jury could determine that Plaintiff's distress was severe enough to sustain a claim of outrage.

Accepting Plaintiff's version of the facts as true, a reasonable jury could determine that Davis's actions meet the criteria set forth by Alabama law for the tort of outrage and that Davis acted in bad faith, willfully, or maliciously. Accordingly, Davis is not shielded by Alabama's discretionary immunity statute as to Count V, and his motion for summary judgment as to Count V is due to be DENIED.

### C.   Count VI - Assault and Battery

For all the reasons discussed in this court's analysis of discretionary-function immunity, Davis's conduct (accepting plaintiff's version of the facts as true) was without justification and a reasonable jury could determine that his actions were done in bad faith, maliciously, or willfully, removing the shield of immunity. Accordingly, Davis is not

shielded by Alabama's discretionary immunity statute as to Count VI, and his motion for summary judgment as to Count VI is due to be DENIED.

### D.   Count VII - False Imprisonment

Plaintiff alleges in Count VII of her complaint that Davis, using his position of authority and acting under the color of state law, unlawfully, maliciously, and willfully detained Plaintiff without any civil or criminal violation, depriving her of her personal liberty.   Alabama Code § 6-5-170 defines false imprisonment as "consist[ing] of the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty."   In order to present a valid false imprisonment claim pursuant to an arrest, there must be an absence of arguable probable cause.   Boarders v. City of Huntsville, 875 So.2d 1168, 1179-80 (Ala. 2003).

The charges listed on plaintiff's arrest report are disorderly conduct and resisting arrest.  (Doc. 60-5).   Under Alabama law, "[a] person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he or she does any of the following:

> (1) Engages in fighting or in violent tumultuous or threatening behavior.
>
> (2) Makes unreasonable noise.
>
> (3) In a public place uses abusive or obscene language or makes an obscene gesture.
>
> (4) Without lawful authority, disturbs any lawful assembly or meeting of persons.

(5) Obstructs vehicular or pedestrian traffic, or a transportation facility.

(6) Congregates with other person in a public place and refuses to comply with a lawful order of law enforcement to disperse."

Alabama Code § 13A-11-7.   Also, "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a *lawful* arrest of him or of another person."   Alabama Code § 13A-11-7 (italics added).   In this case, unless Officer Davis had at least arguable probable cause to arrest plaintiff for disorderly conduct, his efforts to arrest her were "lawful" for purposes of charging here with resisting arrest.

Taking the facts given by plaintiff as true, none of her actions rose to the level of disorderly conduct and she did not resist arrest.   For these and the reasons discussed in the court's analysis of Plaintiff's unlawful arrest claim under § 1983, *supra*, there is at least a question as to whether Davis had even arguable probable cause to arrest plaintiff, and absent arguable probable cause, his detention of her for any period of time was unlawful and a false imprisonment.   If a reasonable jury could determine that Davis lacked arguable probable cause to arrest plaintiff, that same jury could find that her warrantless arrest without arguable probable cause was in bad faith or malicious, and amounted to a false imprisonment.   Accordingly, Davis is not shielded by Alabama's discretionary immunity statute as to Count VII, and his motion for summary judgment as to Count VII is due to be DENIED.

49

## E.   Count VIII - Malicious Prosecution

Plaintiff brings Count VIII under § 1983 and, in the event that the court determines that her Fourth Amendment rights were not violated, under Alabama state law.   She alleges in her complaint that Davis charged the Plaintiff with a crime and arrested her without probable cause, violating her Fourth Amendment Right to be free from unreasonable seizure, and that the "arrest was executed maliciously through Defendant's unwarranted use of excessive force, which caused Plaintiff extensive physical and psychological injuries."   (Doc. 1, p. 12).   Ultimately, the criminal charges against Plaintiff were dismissed due to Davis's failure to appear.   The court will address this claim under both federal and state law.

To determine whether Plaintiff has adequately set forth her § 1983 claim of malicious prosecution, the court looks to both federal and state law.   The Eleventh Circuit Court of Appeals has stated:

> To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* in addition to the elements of the common law tort of malicious prosecution.   *See Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86; *Kelly*, 21 F.3d at 1553-55.   As to the constituent elements of the common law tort of malicious prosecution, this Court has looked to both federal and state law and determined how those elements have historically developed. *Uboh*, 141 F.3d at 1002-04; *Whiting*, 85 F.3d at 584-86.   For example, in *Uboh*, this Court examined both federal law and Georgia law and indicated that, for purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution included: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused

damage to the plaintiff accused.   141 F.3d at 1004.   We note that these are also the same elements required under Alabama law for the tort of malicious prosecution.   *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999).

Wood v. Kesler, 323 F.3d 872, 881-82 (11th Cir. 2003)(footnotes omitted), *cert. denied*, 540 U.S. 879 (2003) (italics in original), citing Uboh v. Reno, 141 F.3d 1000, 1002–04 (11th Cir. 1998); Whiting v. Traylor, 85 F.3d 581, 584 (11th Cir.1996).

The torts of false arrest and malicious prosecution do not overlap in time, according to the Eleventh Circuit Court of Appeals.   In Kingsland v. City of Miami, the court explained that a false arrest § 1983 claim may be predicated upon the arrest that precedes the institution of a prosecution, but that a malicious prosecution § 1983 claim requires a post-arraignment seizure that violates the constitution, and may not be predicated on the pre-arraignment seizure.   382 F.3d 1220, 1235-36 (11th Cir. 2004). Although Justice Ginsburg set forth in a concurrence her opinion that a "continuing seizure" may occur where a defendant is forced to appear in court or pay a bond, Albright v. Oliver, 510 U.S. 266, 276-79, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994), that concept was not adopted by the other justices, and has since been rejected by the Eleventh Circuit Court of Appeals and by other circuits.   See, Whiting, 85 F.3d at 584; Reed v. City of Chicago, 77 F.3d 1049, 1052 n.3 (7th Cir. 1996); Nieves v. McSweeney, 241 F.3d 46, 56-57 (1st Cir. 2001).   The Eleventh Circuit Court of Appeals has explained:

Next, Kingsland bears the burden of proving that she was seized in relation to the prosecution, in violation of her constitutional rights.   In the case of a

51

warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted. *See, e.g., Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest."). Thus, the plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was "not one that arose from malicious prosecution as opposed to false arrest." *Id.* at 254 n. 26.

Kingsland v. City of Miami, 382 F.3d 1220, 1235 (11th Cir. 2004).

In this case, Plaintiff has not alleged any "significant deprivation of liberty," beyond the alleged warrantless arrest that would support a § 1983 malicious prosecution claim.   382 F.3d at 1235-36.   There is no evidence that, following her arrest by Davis, plaintiff was seen by a magistrate or arraigned before being released.   It is undisputed that after she was released from the initial arrest, plaintiff was not thereafter "seized" again.   Thus, for purposes of a § 1983 claim of malicious prosecution, plaintiff cannot show the requisite Fourth Amendment seizure.

Plaintiff argues that her incarceration of 9 to 15 hours, along with her required appearances at trial settings on at least three different occasions and the fact that she had to hire an attorney to defend against the criminal charge constitute damage.   However, these damages are more akin to Justice Ginsburg's "continued seizure" theory that has not been adopted by this circuit.   They do not constitute a "post-arraignment seizure." Because plaintiff cannot show a "post-arraignment" seizure, Davis is entitled to summary judgment on her federal § 1983 claim of malicious prosecution.

A claim of malicious prosecution under Alabama law requires a showing of "'(1) a judicial proceeding initiated by the defendant, (2) the lack of probable cause, (3) malice, (4) termination in favor of the plaintiff, and (5) damage.'" Moon v. Pillion, 2 So. 3d 842, 845-46 (Ala. 2008), quoting Lee v. Minute Stop, Inc., 874 So. 2d 505, 512 (Ala.2003) (quoting Cutts v. American United Life Ins. Co., 505 So. 2d 1211, 1214 (Ala.1987)). Malicious prosecution is "an action disfavored in the law.'" Id. (quoting Mitchell v. Folmar & Assocs., LLP, 854 So. 2d 1115, 1117 (Ala.2003), quoting other cases).   "'The reason for such disfavor is clear: "[P]ublic policy requires that all persons shall resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge."'"   Id., quoting Mitchell, 854 So. 2d at 1117 (quoting Eidson v. Olin Corp., 527 So. 2d 1283, 1284 (Ala.1988), quoting in turn Boothby Realty Co. v. Haygood, 269 Ala. 549, 554, 114 So. 2d 555, 559 (1959)).

Viewing the evidence favorably to the plaintiff, she has made a *prima facie* showing of the elements of malicious prosecution under Alabama law.   There is no question that Davis initiated the criminal charges against plaintiff and, under her evidence, did so without even arguable probable cause.   His epithets directed at plaintiff, calling her a "bitch" and threatening to "break [her] fucking arm," create a factual question as to whether he did so with malice.   The judicial proceedings were terminated in plaintiff's favor when the charges against her were dismissed, even if the dismissal was grounded on the City's failure to prosecute rather than on the merits of the charges.   Finally, plaintiff

suffered damages in having to hire an attorney and expend her time attending court proceedings.    Thus, under the version of the evidence presented by the plaintiff (which ultimately may or may not turn out to be true), there is a viable claim for malicious prosecution that must be decided by a jury.

Accordingly Davis's motion for summary judgment as to Count VIII is due to be GRANTED as to plaintiff's federal § 1983 malicious prosecution claim, but DENIED as to her Alabama state-law claim.

### III.   Punitive Damages Sought Against the City

Finally, Plaintiff asserts that she is entitled to punitive damages, and the City has moved to have any claim for punitive damages dismissed.    Because the City is granted summary judgment on all of plaintiff's claims, she is not entitled to any damages, much less punitive damages, from the City.    Accordingly, the motion for summary judgment as to any claim for punitive damages against the City is due to be GRANTED.

### CONCLUSION

In conclusion, Davis's motion for summary judgment regarding Count VIII is due to be GRANTED only with respect to plaintiff's federal § 1983 malicious prosecution claim. Davis's motions for summary judgment regarding Counts I, II, V, VI, VII and VIII (as to the Alabama malicious prosecution claim) is due to be DENIED.   A.C. Roper's motion for summary judgment regarding all claims brought against him (Counts III, IV, and V) is due

to be GRANTED.   The City of Birmingham's motion for summary judgment regarding Counts III, IV, and V, and all other state-law claims purported to be brought against the City, are due to be GRANTED.   The City of Birmingham's motion for summary judgment in regards to the award of punitive damages is due to be and is GRANTED.

A corresponding order will be entered contemporaneously herewith.

DONE this 14th day of March, 2014.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE